Robbins v. Old Tavern at Grafton, Inc., No. 595-11-02 Wrcv (Teachout, J., Apr. 5, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WINDSOR COUNTY, SS.**

| | | |
|---|---|---|
| **JUDITH N. ROBBINS** | } | |
| | } | **Windsor Superior Court** |
| **v.** | } | **Docket No. 595-11-02 Wrcv** |
| | } | |
| **OLD TAVERN AT GRAFTON, INC.**[1] | } | |

**MEMORANDUM OF DECISION**
**Defendant's Motion for Summary Judgment, filed November 25, 2003**

Plaintiff Judith Robbins claims that the defendant, Old Tavern at Grafton, Inc. (Old Tavern), wrongfully terminated her employment when it laid her off as it entered its slow season, and then failed to contact her and rehire her when its next season began. The case is before the court for consideration of Old Tavern's Motion for Summary Judgment. Attorney Norman E. Watts represents Ms. Robbins. Attorney Eric Jones represents the Old Tavern.

**Undisputed Facts**[2]

The Old Tavern operates a country inn and restaurant in Grafton, Vermont. The Old Tavern employed plaintiff Judith Robbins as a server in its restaurant from May of 2000 until November of 2001. She was initially hired as a full-time employee, and she was told she would receive employee benefits. She was hired as an "a.m. server," meaning that she would work the breakfast and lunch shifts.

Under the Old Tavern benefits policy, employees who worked 32 hours per week, or

---

[1] Defendant, the Old Tavern, states that its correct name is: Old Tavern at Grafton, LLC.

[2] The court derives the undisputed facts by reference to the parties' statements of undisputed facts under V.R.C.P. 56(c)(2), to the extent they are supported by underlying evidence in the record. The court does not include conclusions of law that may have been asserted as fact.

1,000 hours per year, were eligible for employment benefits (such as health insurance and retirement benefits). Ms. Robbins was aware of these requirements. The Old Tavern's fiscal year is November 1 through October 31. Based on this fiscal period, the Old Tavern's bookkeeper reviewed employees' hours by November 1 to determine eligibility for benefits for the following fiscal year. Soon after the Old Tavern hired Ms. Robbins, it determined that she would likely work at least 1,000 hours in her first year. Based on this expectation, the Old Tavern treated Ms. Robbins as eligible for benefits. Accordingly, beginning September 1, 2000, she received benefits.

In 2000, Ms. Robbins worked 1025.16 hours: she worked 40 hours for four weeks, and over 32 hours (but less than 40 hours) for an additional ten weeks. In 2001, she worked 657.22 hours: she never worked 40 hours in a week, she worked more than 32 hours in a week only three times, she worked no hours for seven weeks (in addition to five weeks when the Old Tavern was closed), and she worked less than 20 hours for many weeks. For many months before October of 2001, she worked less than 30 hours per week.

The Old Tavern closed from April 1 through May 6, 2001. During this time all employees, including Ms. Robbins, were laid off.

Throughout her time at the Old Tavern, Ms. Robbins requested the opportunity to work dinner shifts and special events (such as weddings, private parties, and special functions). Her supervisor, Chef Tom Bivins, permitted her to work several dinner shifts and special functions. However, she did not regularly work those shifts; she primarily worked the "a.m. shifts" (breakfast and lunch).

Throughout Ms. Robbins's employment, her supervisor (Chef Bivins) received complaints concerning her performance from co-workers, customers, and the Innkeeper (Kevin O'Donnell), and he also received positive comments concerning Ms. Robbins.

She admits that she completely forgot to place a customer's order, and sometimes had difficulty with orders and with handling money. She also testified that co-workers sometimes complained that she was not carrying her weight, and did not want to share tips with her. Ms. Robbins also recalls that a co-worker complained once that she was not scheduled to work when other workers were required to move furniture.

Ms. Robbins also received positive feedback from at least one co-worker and from customers. Chef Bivins complimented her for positive comment cards. He generally did not tell her about negative comments. He did tell her some of his concerns about her performance, but he did not tell her all of his concerns. Since most of the specific comments, both positive and negative, are inadmissible hearsay, they are not considered for purposes of this motion. V.R.C.P. 56 (e). Moreover, since her level of performance is not at issue, the content of those comments is not material. V.R.C.P. 56 (c)(3).

Chef Bivins testified that he would have terminated Ms. Robbins's employment if a

qualified waiter or waitress had been available to replace her, but he did not tell her that. He testified that although he would have replaced her if able, he was unable to find a replacement "whose skill level and whose ability to show up for work every day was as good as Judy's."

In the summer of 2001, Ms. Robbins began to request a substantial amount of time off. First, she requested 10 days off to care for a friend who was ill. Then, she requested time off due to an illness. By October of 2001, she had missed over five weeks of work.

On or about October 2, 2001, Ms. Robbins gave her supervisor a note from Dr. Lynn Webster. The note stated that Ms. Robbins was having trouble with her health, and recommended that she work no more than two shifts per week. The Old Tavern agreed to this medical restriction. Ms. Robbins testifies that she no longer needs to be restricted to two shifts per week. However, she has neither asked for nor received a note from Dr. Webster amending the earlier recommendation.

By the fall of 2001, the Old Tavern had decided that it would stop serving lunch in its restaurant. That meant that the servers would no longer work a lunch shift, and that the a.m. servers would work primarily on the breakfast shift. Ms. Robbins remained eligible to serve breakfasts and dinners, but she was not assigned many dinner hours.

Ms. Robbins's relationship with Mr. Bivins was "off and on." He could become short tempered and abrupt with people. He was angry "a fair amount of time," and he would yell, scream, kick, and throw things. This behavior scared Ms. Robbins. However, she did not report to anybody that she was scared, because she did not feel that anything would be done about it.

On October 22, 2001, Ms. Robbins asked to meet with the Assistant Innkeeper, Virginia Lisai. At the meeting Ms. Robbins reported that 10 days earlier (on October 12, 2001), Chef Bivins had yelled at her, grabbed her by the arm, and pushed her toward the dining room door. Ms. Robbins does not recall any pain caused by this incident, but she later noticed a bruise on her arm. She did not need medical treatment. She delayed reporting the incident because she was afraid of losing her job. After the meeting on October 22, Ms. Lisai reported this matter to Innkeeper O'Donnell.

After Ms. Lisai and Mr. O'Donnell discussed the matter, Ms. Lisai met again with Ms. Robbins and encouraged her to prepare a written complaint. Ms. Robbins stated that she would submit a written complaint. Nobody discouraged Ms. Robbins from making a formal report. Three weeks later, on November 11, 2001, Ms. Robbins delivered a written complaint.

Meanwhile, news of Ms. Robbins's complaint reached the Old Tavern's President, Stephan Morse. Although Ms. Robbins had not yet submitted a written complaint, Mr. Morse initiated an immediate investigation. He interviewed Ms. Robbins, another waitress who had witnessed the incident, and Mr. Bivins.

When Mr. Morse interviewed Ms. Robbins, he asked whether she wanted specific action

3

taken.  She said she did not want anything in particular.  She thought that Mr. Bivins should be fired, but she did not think it was her place to say that to Mr. Morse.  When Mr. Morse interviewed Mr. Bivins, he denied that he had touched Ms. Robbins.

After the interviews, Mr. Morse prepared a memorandum outlining his investigation and stating his findings.  Due to conflicting versions of events, he was unable to determine exactly what had happened.  However, he counseled Mr. Bivins on improving his management style.  In addition, he required Mr. Bivins to attend anger management therapy.  On November 21, 2001, Mr. Morse sent Ms. Robbins a letter, advising her of the results of the investigation.  Ms. Robbins had a feeling that the Old Tavern management supported Mr. Bivins and not her.  She believes that the reduction in her schedule was related to her report of the October 12 incident.

The hospitality industry in Vermont is influenced by seasonal variations in business.  The Old Tavern's "busy season" is from mid-May through October, while business drops significantly for the remainder of the year.  During the "down season," the Old Tavern reduces its staff.  In addition, for approximately six weeks each year (generally in April and early May), the Old Tavern closes.

In November of each year, the Old Tavern lays off several employees.  Generally, the employees receive unemployment benefits and seek re-employment in the spring.  In November of 2001, the Old Tavern laid off seven employees, including Ms. Robbins.  All employees who were laid off, except for Ms. Robbins, filed for unemployment benefits.

When the Old Tavern closes in the spring, it tells its employees then working when the restaurant will be reopening.  The Old Tavern also calls these employees or otherwise notifies them of when the restaurant will reopen.  Even when the Old Tavern is closed, it continues to pay these employees for accumulated vacation time, and some of them seek unemployment benefits if vacation pay runs out before the inn reopens in the spring.

When Ms. Robbins was laid off in November 2001, she was not working full-time.  In addition, because of the fact that the Old Tavern had stopped serving lunch, many of the hours she had previously worked were no longer available.  Moreover, since November marked the start of the slow season, remaining shifts were sparse.  In addition, at Ms. Robbins's request due to her medical restrictions, she was working a part-time schedule.  When working shifts are limited, the Old Tavern gives priority to full-time employees.

After November of 2001, Ms. Robbins made no effort to contact her supervisor or the Innkeeper concerning re-employment.  She did call the front desk to ask if she was on the schedule, and she was told that she was not on the schedule.  She does not remember when she made that call.  She did not inquire about available shifts because she was considering filing a lawsuit.

After the November 2001 layoff, Ms. Robbins worked as a waitress for another employer, a restaurant called Raspberries & Thyme.  She worked an average of 2 to 3 shifts per week at Raspberries & Thyme.  This schedule is similar to the schedule she worked at the Old

Tavern at the time of her layoff.

## Conclusions of Law

### *Count 1: Breach of an Implied Contract*

In count 1, Judith Robbins claims that the Old Tavern constructively discharged her by laying her off in November of 2001, and by failing to contact her and rehire her when it re-opened for the following season in May of 2002. Her theory is that she had an implied contract of employment with Old Tavern, including a provision for rehiring in the spring, based on Old Tavern's established practice of re-contacting and rehiring seasonal workers who had been laid off for the off season.[3] The Old Tavern's position is that it had no obligation to rehire an employee who expressed no interest in returning and who had already secured new employment.

"[A]n employment contract for an indefinite term is an 'at-will' agreement, terminable at any time for any reason." Taylor v. National Life Insurance Co., 161 Vt. 457, 462 (1994) (quoting Foote v. Simmonds Precision Prods. Co., 158 Vt. 566, 570 (1992)). However, company procedures or practices may develop into enforceable promises, if they are "clearly established and uniformly and consistently applied throughout the company." Ross v. Times Mirror, Inc., 164 Vt. 13, 22 (1995) (citations omitted).

For purposes of this decision, the court accepts the proposition that a seasonal employer could modify an at-will employment agreement unilaterally, by consistently and uniformly rehiring all laid-off workers when the company re-opens for the following season. *See* Dillon v. Champion Jogbra, Inc., 13 Vt.L.W. 357, 358 (2002) (unilateral modification by policies or practices). However, in order to pursue this theory, Ms. Robbins would have to show that the Old Tavern followed a consistent practice of calling back employees in her category.

Viewed in the light favoring the plaintiff, the record shows that the Old Tavern follows a practice of contacting and calling back full-time employees who are laid off when the business closes down completely in the spring. When they leave for the season, those employees are told when they are expected to return. However, there is no evidence that the Old Tavern follows a practice of calling back *all* employees, including part-time employees who are laid off when the business slows down in November. There are no facts showing that any of the employees laid off in November of 2001 were called back in May of 2002.

In short, Ms. Robbins has failed to present prima facie evidence of her claim. There is no basis for concluding that the Old Tavern had modified her at-will employment by consistently and uniformly rehiring all laid-off workers, including those laid off in both November and April,

---

[3] Ms. Robbins has suggested that an implied contract may also arise from an employer's written manuals. However, neither party has submitted any manual into the summary judgment record, nor has either party included provisions from any manual within its Rule 56(c)(2) statement of facts.

when it re-opens for the following season.  Even when the record is viewed in a light favorable to Ms. Robbins, it does not support a claim for breach of an implied contract.  Old Tavern is entitled to summary judgment on count 1.

*Count 2: Breach of the Covenant of Good Faith and Fair Dealing*

Ms. Robbins alleges that the Old Tavern's actions breached the covenant of good faith and fair dealing that exists in every contract.  Plaintiff has not explained how count 2 differs from count 1.  The complaint simply states that the covenant "protects the parties from 'bad faith' conduct that violates 'community standards of decency, fairness or reasonableness.'"

An implied covenant of good faith and fair dealing exists in every contract, "to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"  Carmichael v. Adirondack Bottled Gas Corp., 161 Vt. 200, 208 (1993) (quoting Restatement (Second) of Contracts § 205 comment a (1981)).  However, a claimed breach of the covenant of good faith and fair dealing is not favored as a separate cause of action arising out of an employment setting where there is not otherwise a cause of action for wrongful termination.  Ross, 164 Vt. at 23.  A covenant as to tenure in an unmodified at-will contract would conflict with the employment-at-will doctrine and result in "unreasonable judicial interference into what is a private relationship."  Id. (citations omitted).

Ms. Robbins claims that her at-will employment was modified by a company practice of rehiring laid-off seasonal workers when the business resumes in the spring.  However, the court has concluded that she has not proven her claim, and that her employment was at-will.  Moreover, she has not cited to evidence in the record showing that the Old Tavern had violated the "community standards of decency, fairness, or reasonableness" that the covenant of good faith and fair dealing seeks to protect.  Boulton v. CLD Consulting Engineers, Inc., 2003 VT 72, ¶ 12, 14 Vt.L.W. 238, 240 (2003) (citing Carmichael).  "[N]othing in the record suggests that [Old Tavern's] executives abused their authority or lacked a reasonable basis for their actions with respect to plaintiff."  Id. ¶ 13.  For both of these reasons, Defendant is entitled to summary judgment on this count.

*Count 3: Wrongful Retaliatory Discharge*

Ms. Robbins also alleges that the Old Tavern retaliated against her for reporting the chef's physical and mental abuse of her.  She claims that her report of the October 2001 incident was the reason why the Old Tavern laid her off in November of 2001, and then failed to rehire her in May of 2002.  She maintains that the Old Tavern's actions violated public policy that disapproves of retaliation for employees speaking out in their own defense.

> To succeed on her retaliation claims, plaintiff must show that (1) she was engaged in a protected activity, (2) the [employer] knew of that activity, (3) plaintiff suffered adverse employment action, and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action.  *Gallipo*

*v. City of Rutland*, 163 Vt. 83, 92, 656 A.2d 635, 642 (1994). Plaintiff may establish the required causation indirectly through the timing of her protected activity and the [employer's] alleged retaliatory actions. *Id.* at 93, 656 A.2d at 642. If plaintiff establishes a prima facie case of retaliation, [the employer] must proffer a legitimate, nondiscriminatory reason for [its] actions. *Murray v. St. Michael's College*, 164 Vt. 205, 210, 667 A.2d 294, 299 (1995). Plaintiff then must prove by a preponderance of the evidence that the [employer's] reasons for [its] actions are a pretext for discrimination. *Id.*

Mellin v. Flood Brook Union School District, 173 Vt. 202, 211 (2001). Also see Beckmann v. Edson Hill Manor, 171 Vt. 607 (2000).

For purposes of this motion, the court accepts Ms. Robbins's theories (1) that it would violate public policy to allow an employer to terminate an employee merely because she had complained about physical and mental abuse by a supervisor, and (2) that the timing is suspicious, where Old Tavern laid off Ms. Robbins shortly after the president had learned about her complaint. However, the Old Tavern has set forth legitimate reasons for its actions, as described below, and Ms. Robbins has not submitted evidence to show that Old Tavern's reasons are a pretext for discrimination.[4]

The Old Tavern lays off employees in November of every year, because the business is then entering its slow season. In November of 2001, Ms. Robbins was among the seven employees laid off because the Old Tavern gives priority to full-time employees. At that time, she was working only part-time, at her request. Her hours were further limited when the restaurant stopped serving lunch, because she was an "a.m. server." The Old Tavern's decision to lay her off (along with others) was consistent with its policy of cutting back for the slow season, while retaining full-time employees until the restaurant closes in April for several weeks. She has presented no evidence to show that the Old Tavern's proffered reasons are pretextual. When asked why she believes that her employer's actions were to retaliate against her for her complaint, she answered, "It's just a feeling that I have." (Robbins deposition at 80).

A plaintiff's "feeling" is not sufficient to show that her layoff was a pretext, when it is standard practice for the Old Tavern to lay servers off in November, and six other people in the same circumstances as herself were also laid off at the same time. There must be additional facts from which the jurors could infer pretext, and there are no such facts in this case. On the contrary, the facts suggest that the Old Tavern took her complaint about the chef's conduct seriously, acting responsibly to investigate the incident and change staff behavior even before

---

[4] The Old Tavern maintains that it responded appropriately to Ms. Robbins's complaints. The president, Stephan Morse, investigated the incident and later required Chef Bivins to attend anger management theory. Ms. Robbins still believes that the Old Tavern management supported Mr. Bivins and not her. The court need not resolve any remaining dispute over the underlying incident, as Ms. Robbins has not supported her pretext claim for the reasons set forth above.

7

she had filed a written complaint.

Ms. Robbins also suggests that the Old Tavern retaliated against her by failing to rehire her the following May. Here too, she has failed to present evidence to support her claim. The Old Tavern did not contact her to invite her back, but there is no evidence that its actions toward her differed from its actions toward other employees in her class, specifically those who had been laid off in November. The Old Tavern generally does invite back full-time employees who are laid off when the restaurant closes in April, but the record does not show that it generally contacts part-time employees who are laid off in November to rehire them for the reopening in May.

The undisputed admissible evidence does not support Ms. Robbins's claims that the Old Tavern discriminated against her because she had made a complaint against Chef Bivins. Therefore, Defendant is entitled to summary judgment on this count.

*Count 4: Age Discrimination*

In response to Old Tavern's motion, Ms. Robbins states that she does not intend to pursue this count. Summary judgment will be granted on this count.

**ORDER**

The Old Tavern's Motion for Summary Judgment is *granted* on all counts. Judgment will be entered for the Defendant.

Dated this _____ day of April, 2004.

_____
Hon. Mary Miles Teachout
Superior Court Judge

8

**STATE OF VERMONT**
**WINDSOR COUNTY, SS.**

JUDITH N. ROBBINS          }

                                           }          **Windsor Superior Court**

v.                                 }          **Docket No. 595-11-02 Wrcv**

                                           }

OLD TAVERN AT GRAFTON, INC.     }

## JUDGMENT

This action came on for consideration of the Motion of Defendant for Summary Judgment filed November 25, 2003 , Honorable Mary Miles Teachout, presiding, and the court, on April ＿, 2004 having granted Defendant's Motion for Summary Judgment,

It is ORDERED and ADJUDGED that judgment is entered for the Defendant, and Plaintiff shall take nothing on the claim.

Dated this _____ day of April, 2004.

                                    _____

                                    Hon. Mary Miles Teachout
                                    Superior Court Judge